**Raymond E. TRAFELET et al.,
Plaintiffs-Appellants,**

**v.**

**James R. THOMPSON et al.,
Defendants-Appellees.**

No. 78–1941.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1978.

Decided March 16, 1979.

Rehearing and Rehearing En Banc
Denied April 24, 1979.

Jack R. Schmetterer, Chicago, Ill., for plaintiffs-appellants.

Barry T. McNamara, Chicago, Ill., for intervenor-appellee.

Don H. Reuben, Chicago, Ill., for defendants-appellees.

Before TONE, LAY,* and BAUER, Circuit Judges.

TONE, Circuit Judge.

This action challenges the constitutionality of the Illinois Compulsory Retirement of Judges Act. Section 1 of that Act, Ill.Rev. Stat. ch. 37 § 23.71 (1977), provides in substance that a judge is automatically retired after the next general election following his

---

* The Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

70th birthday.[1] Section 2, *id.* § 23.72, creates grandfather exceptions to § 1, which, so far as they are pertinent here, allow the excepted judges to remain in office until they have served long enough to secure certain pension rights.[2] After a trial, the district court held that the Act did not violate either the United States Constitution or the Illinois Constitution and entered judgment for the defendants. We affirm the judgment.

The district court certified two classes of plaintiffs: (1) all judges of the Supreme, Appellate, and Circuit Courts of Illinois whom the Act will force into retirement before the expiration of their certified terms or preclude from running for retention in office;[3] and (2) all registered voters in Illinois who will be denied the opportunity to vote for the judicial candidates of their choice because the Act precludes those candidates from running for election to, or retention in, office. The defendants are the state officers responsible for executing the provisions of the challenged statute.

The plaintiff judges assert several challenges to the Act. Section 1 (§ 23.71) is attacked on two federal grounds:

(1) It is said to violate the equal protection clause of the Fourteenth Amendment by creating distinctions between judges of the age of 70 and older and judges younger than 70, and between judges and all other elected officials, who are not subject to mandatory retirement provisions. These distinctions, it is argued, are not rationally related to the stated purpose of the Act.

(2) It is said to violate the due process clause of the Fourteenth Amendment by creating an irrebuttable presumption.

Section 2 of the Act (§ 23.72) is attacked on one federal and one state ground:

(1) It is said to violate equal protection by allowing certain judges to remain in office beyond the age of 70 on the basis of criteria unrelated to the purpose of the Act.

(2) It is said to violate Article VI, § 15(a) of the Illinois Constitution[4] by

---

1. Section 1 provides as follows:

 A judge is automatically retired on the first Monday of December next after the general election at which members of the General Assembly are elected immediately following the attainment of age 70 of such judge. Such judge shall conclude all matters pending before him unless the Supreme Court makes other provisions for the disposition of such matters.

2. Section 2 provides as follows:

 The provisions of Section 1 [23.71] of this Act are suspended, however, with respect to any judge in office on the effective date of this Act [July 20, 1965]. Such judge may continue to serve until the occurrence of one of the 3 following dates whichever occurs last: (1) January 1, 1976; or (2) the date upon which such judge completes 18 years of judicial service in courts of record including all such service rendered prior to, on, and after the effective date of this Act; or (3) the date upon which such judge reaches age 70. The provisions of Section 1 of this Act are also suspended as to any judge in office on June 30th, 1973 who cannot fulfill the minimum eligibility requirements under the Judges Retirement System of Illinois, Article 18 of the Illinois Pension Code [Ill.Rev.Stat. ch. 108½, § 18–101, *et seq.*, (1977)], on the day of his becoming age 70, but who can do

so by remaining in office after age 70 for the balance of his current term.

 Upon reaching the date provided in this Section 2, whichever is appropriate, such judge is retired on the first Monday in December next after the general election for members of the General Assembly occurring immediately after such retirement date except that such judge shall complete all matters pending before him unless the Supreme Court makes other provisions for the disposition of such matters.

3. In Illinois, elected judges who seek another term in office run unopposed on a non-partisan "retention ballot" and must get the affirmative vote of three-fifths of the electors voting on the question. Ill.Const. art. VI, § 12(d) provides in pertinent part as follows:

 . . . The names of Judges seeking retention shall be submitted to the electors, separately and without party designation, on the sole question whether each Judge shall be retained in office for another term. . . . The affirmative vote of three-fifths of the electors voting on the question shall elect the Judge to the office . . . .

4. Ill.Const. art. VI, § 15(a) reads in relevant part:

 The General Assembly may provide by law for the retirement of Judges and Associate Judges at a prescribed age.

failing to prescribe a single age at which judges must retire.

The plaintiff voters assert that the Act violates their rights under the equal protection clause by discriminatorily denying them the opportunity to vote for candidates of their choice.

## The Judges' Claims

1. *Equal Protection Challenges to § 1 of the Act.*

▮ The applicable standard is whether the challenged classification is rationally related to a proper legislative purpose. Neither the right of governmental employment, *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), nor the right to run for elective office, *Bullock v. Carter*, 405 U.S. 134, 142–143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), is fundamental. *See* J. Nowak, R. Rotunda, and J. N. Young, *Handbook on Constitutional Law* 686 and 643 (1978) and L. Tribe, *American Constitutional Law*, § 13–19 at 775–777 (1978). Judicial office is no exception. *Napolitano v. Ward*, 457 F.2d 279, 284 (7th Cir. 1972), *cert. denied*, 409 U.S. 1037, 93 S.Ct. 512, 34 L.Ed.2d 486 (1973). Furthermore, age is not a suspect classification for equal protection purposes. *Massachusetts Board of Retirement v. Murgia, supra*, 427 U.S. at 313–314, 96 S.Ct. 2562. Accordingly, like the plaintiffs in *Vance v. Bradley*, —— U.S. ——, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), in which the Supreme Court sustained a statute providing for mandatory retirement of Foreign Service officers at age 60, the plaintiff judges here concede that the rational relationship standard is applicable and contend only that the court failed to apply the correct standard properly.

The judges do argue, however, that we may properly consider only those legislative purposes articulated by the state at the time the statute was enacted. Whatever doubt on this point may have been engendered by language in some of the cases in recent years [5] seems to have been resolved by the Supreme Court's recent opinion in *Vance v. Bradley, supra*. There the Court, referring to the rational relationship standard, said,

> In an equal protection case of this type . . . those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

—— U.S. at ——, 99 S.Ct. at 950. In support of that statement the Court cited several cases stating the standard of whether any state of facts may reasonably be conceived to justify the classification [6] and described *McGinnis v. Royster*, 410 U.S. 263, 274, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973), with apparent approval as "finding that the legislature 'could have concluded rationally that' certain facts were true." We conclude that we are not limited to the legislative purpose articulated by the state at the time of enactment, although even if we were we would sustain the statute.

A review of the history of the Act reveals its purpose. In creating the Judicial Advisory Council of Illinois in 1957 the Illinois General Assembly provided,

> The Council shall, by continuous study of the problems involved, devise means to effect the improvement of the administration of justice in and with relation to the State, and to formulate all suggestions and recommendations concerning legislation and other measures designed to bring about such improvement.

---

**5.** *See White v. Fleming*, 522 F.2d 730, 736 n.8 (7th Cir. 1975). Plaintiffs rely particularly on the statement in *Massachusetts Board of Retirement v. Murgia, supra*, 427 U.S. at 314, 96 S.Ct. at 2567, that ". . . the State's classification rationally furthers the purpose identified by the State," which is not the same as saying no other purpose would have been considered.

**6.** In the first case cited, *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911), the Court said,
> [I]f any state of facts reasonably can be conceived that would sustain [the challenged statute], the existence of that state of facts at the time the law was enacted must be assumed.

Ill.Rev.Stat. ch. 37, § 605 (1957). In pursuit of this goal, the Council recommended the legislation on mandatory retirement that became the Act before us. When that legislation was introduced in the legislature in 1963, the Council announced the specific purpose of § 1 as follows:

> It is the consensus of the Council that a mandatory retirement at age 70 will tend to insure a more vigorous judiciary to which the public is entitled.

*Report of the Judicial Advisory Council of Illinois* 9–10 (June 1963) (Submitted to the Governor and the Seventy-Third General Assembly of the State of Illinois). Thus it is fair to infer that the purpose of the Act was to further this articulated purpose of insuring a more vigorous judiciary.

Plaintiffs contend that the classification created in § 1 of the Act is not rationally related to that purpose. First, they argue that the state has no rational basis for mandatorily retiring judges but no other elected state officials. Second, they argue that there is no rational basis for treating judges differently when they reach age 70, and that the Illinois laws for removing judges under age 70 from office should serve as well for judges 70 and over.[7]

The legislature could rationally have justified treating judges differently from other officials on the ground that the work of judges makes unique and exacting demands on faculties that age tends to erode. Although the defenders of the statute were not required to establish by evidence a rationality that is obvious from the common experience of mankind, *see Vance v. Bradley, supra,* —— U.S. at —— & n.28, 99 S.Ct. at 950, they nevertheless did so. The district court found that published scientific data, some predating the enactment of the Act in 1965, show an association between aging, specifically during the sixth and seventh decades of life, and a decline in intellectual function and personality factors. It is irrelevant that evidence was adduced to rebut this data:

> It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety.

*Rast v. Van Deman & Lewis Co.,* 240 U.S. 342, 357, 36 S.Ct. 370, 374, 60 L.Ed. 679 (1916), quoted in *Vance v. Bradley, supra,* —— U.S. at ——, 99 S.Ct. at 951.

■ The equal protection clause does not prohibit the legislature from adopting a more rigorous policy for assuring excellence in the judiciary than for other elective offices. As the Supreme Court said of the Foreign Service in *Vance v. Bradley, supra,* —— U.S. at ——, 99 S.Ct. at 946.

> The judgment that the Foreign Service needs such a system more than do many other departments is one of policy, and this kind of policy, under our constitutional system, ordinarily is to be "fixed only by the people acting through their elected representatives."

Citing *Fireman v. Chicago, R. I. & P. R. Co.,* 393 U.S. 129, 138, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968).

■ If more were needed, it would also be relevant that judges are the only public officeholders in Illinois who, once elected, are not opposed by another candidate when they seek reelection but rather "run against their records." See note 3, *supra.* Because of this retention system, it is much more difficult to dislodge a judge than an official who must run against another candidate. Mandatory retirement for judges is rationally related to the difference in the retention rights of judges and other elected officials.

Many judges compelled to retire at 70 will still be highly competent. When, however, a statutory requirement of retirement at a given age is tested by the rational relationship standard, the line drawn by the legislature will be accepted where "[t]here is no indication that [the statute] has the effect of excluding from service so few . . . who are in fact unqualified as to render age . . . a criterion wholly unrelated to the objective of the statute." *Massachusetts Board of Retirement v. Mur-*

---

7. *See* Ill.Const. art. VI, §§ 15(b)–(g), described in note 8, *infra.*

*gia, supra,* 427 U.S. at 315–316, 96 S.Ct. at 2568. *See also Vance v. Bradley, supra,* —— U.S. at —— – ——, 99 S.Ct. at 949 (the classification was not made invalid by "the fact that individual Foreign Service employees may be able to perform past age 60"); *Weinberger v. Salfi,* 422 U.S. 749, 776–777, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). Perfection is not required and whether "we . . . think [the legislature] was unwise in not choosing a means more precisely related to its primary purpose is irrelevant." *Vance v. Bradley, supra,* —— U.S. at ——, 99 S.Ct. at 949.

 It follows that the existence of other means for evaluating a judge's performance, on which plaintiffs rely, does not render mandatory retirement at age 70 unconstitutional. In *Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. at 316, 96 S.Ct. at 2568, the Court stated:

That the State chooses not to determine fitness more precisely through indi-

vidualized testing . . . is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation.

If it were necessary to go further, it could readily be demonstrated that here, more than in *Murgia,* there are good reasons to consider individualized evaluations an inadequate substitute for a maximum age limitation. Fitness to be a policeman is more susceptible of objective evaluation than fitness to be a judge, because decline in the intellectual ability and the personality factors essential for effective judicial performance are more difficult to measure than decline in physical condition. The Illinois evaluation means to which plaintiffs refer involve an investigation, a complaint, and an adjudicative hearing.[8] As a practical matter, this cumbersome individualized removal procedure, attended as it is with stigma to the judge, is unlikely to be used except in the most extreme cases. Informal pressures to retire are scarcely more effective. Usually the reluctance of judges to ask a colleague to step down is exceeded only by his reluctance to do so.[9] It was

---

**8.** The evaluation process, set forth in Ill.Const. art. VI, §§ 15(b)–(g), requires prosecution by a Judicial Inquiry Board in a public hearing before the Courts Commission, which has authority to order, *inter alia,* mandatory retirement of the judge. "A Judicial Inquiry Board is created . . . with authority to conduct investigations, receive or initiate complaints concerning a Judge or Associate Judge, and file complaints with the Court Commission. . . . The Board shall prosecute the complaint[s]." The Courts Commission, which consists of one Supreme Court Judge, two Appellate Court Judges, and two Circuit Court Judges, has "authority after notice and public hearing, . . . (2) to suspend, with or without pay, or retire a Judge or Associate Judge who is physically or mentally unable to perform his duties."

**9.** *See* C. Hughes, *The Supreme Court of the United States* 75–76 (1928):

Justice Field tarried too long on the bench. It is extraordinary how reluctant aged judges are to retire and to give up their accustomed work. They seem to be tenacious of the appearance of adequacy. I heard Justice Harlan tell of the anxiety which the Court had felt because of the condition of Justice Field. It occurred to the other members of the Court that Justice Field had served on a committee which waited upon Justice Grier

to suggest his retirement, and it was thought that recalling that to his memory might aid him to decide to retire. Justice Harlan was deputed to make the suggestion. He went over to Justice Field, who was sitting alone on a settee in the robing room apparently oblivious of his surroundings, and after arousing him gradually approached the question, asking if he did not recall how anxious the Court had become with respect to Justice Grier's condition and the feeling of the other Justices that in his own interest and in that of the Court he should give up his work. Justice Harlan asked if Justice Field did not remember what had been said to Justice Grier on that occasion. The old man listened, gradually became alert and finally, with his eye blazing with the old fire of youth, he burst out:

"Yes! And a dirtier day's work I never did in my life!"

That was the end of that effort of the brethren of the Court to induce Justice Field's retirement; he did resign not long after.

This anecdote is also recounted in J. Frankel, "Removal of Judges" 48 *Judicature* 177, 178 n.11 (1965); R. Shogan, *A Question of Judgment: The Fortas Case and the Struggle for the Supreme Court* 250 (1972); D. Jackson, *Judges* 275 (1974).

entirely rational for the legislature to believe that the most satisfactory way to insure a vigorous judiciary was to impose a maximum age limitation.

It should be noted also that at least one public purpose in addition to insuring a vigorous judiciary is served by the Act. It can hardly be questioned that the risk of death and disabling illness increases with age. Mandatory retirement thus reduces delays in the administration of justice caused by death or disabling illness of sitting judges.

Our conclusion that mandatory retirement for judges at age 70 does not violate the equal protection clause is supported by the case law involving mandatory retirement of various kinds of governmental officers and employees. *Vance v. Bradley, supra,* —— U.S. ——, 99 S.Ct. 939, 59 L.Ed.2d 171; *Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520; *Rubino v. Ghezzi,* 512 F.2d 431 (2d Cir.), *cert. denied,* 423 U.S. 891, 96 S.Ct. 187, 46 L.Ed.2d 122 (1975); *Palmer v. Ticcione,* 576 F.2d 459 (2d Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979); *Johnson v. Lefkowitz,* 566 F.2d 866 (2d Cir. 1977); *Weisbrod v. Lynn,* 383 F.Supp. 933 (D.D.C.1974), *aff'd summarily,* 420 U.S. 940, 95 S.Ct. 1319, 43 L.Ed.2d 420 (1975); *McIlvaine v. Pennsylvania State Police,* 454 Pa. 129, 309 A.2d 801 (1973), *appeal dismissed for want of substantial federal question,* 415 U.S. 986, 94 S.Ct. 1583, 39 L.Ed.2d 884 (1974).

2. *Due Process Challenge to § 1 of the Act.*

Plaintiffs argue that § 1 violates the due process clause by creating an irrebuttable presumption that judges become unfit to hold office at age 70.

In *Miller v. Carter,* 547 F.2d 1314, 1316–1319 (7th Cir. 1977), *aff'd by an equally divided court,* 434 U.S. 356, 98 S.Ct. 786, 54 L.Ed.2d 603 (1978), we expressed our uncertainty concerning the scope and continuing force of the doctrine of irrebuttable presumptions, and noted the Supreme Court's

failure to refer to the doctrine in *Massachusetts Board of Retirement v. Murgia, supra,* which we thought "particularly striking in light of Mr. Justice Rehnquist's dissent in *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 659 [, 94 S.Ct. 791, 39 L.Ed.2d 52] (1974), adverting specifically to the effect of the irrebuttable presumption doctrine on mandatory retirement statutes." 547 F.2d at 1318 & n.16. Since our decision in *Miller,* the Supreme Court has not relied upon the doctrine in any case, although the Court has had several opportunities to do so. *Vance v. Bradley, supra,* is the second mandatory retirement decision in which the Supreme Court has not referred to the irrebuttable presumption doctrine; even Justice Marshall, the lone dissenter, although specifically pointing out that the district court judgment invalidating the statute which the Court was reviewing could be sustained on any ground finding support in the record, did not mention the irrebuttable presumption doctrine. *See also Friedman v. Rogers,* —— U.S. ——, —— n.8, 99 S.Ct. 887, 893, 59 L.Ed.2d 100, 108 (1979); *First National Bank v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 490 n.18, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Fiallo v. Bell,* 430 U.S. 787, 791, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 22–24, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). *Cf. Elkins v. Moreno,* 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978). *See deLaurier v. San Diego Unified School District,* 588 F.2d 674 at 682–683 n.16 (9th Cir. 1978).

A survey of Court of Appeals opinions written after *Miller* reveals that we have not been the only court "unwilling to plunge unnecessarily into the thicket of irrebuttable presumptions . . . ." 547 F.2d at 1317. Among these opinions we find only one that relied solely on the irrebuttable presumption doctrine to strike down a statute: *Gurmankin v. Costanzo,* 556 F.2d 184 (3d Cir. 1977), held that the Philadelphia School District's policy prohib-

iting blind teachers from teaching students who were not blind violated due process by creating an irrebuttable presumption of unfitness. The School District refused to give blind teachers the Philadelphia Teachers Examination, thus depriving them of the opportunity, given to sighted teachers, to prove their competency. The court found it unnecessary to evaluate the equal protection arguments because it affirmed the trial court's due process holding, 556 F.2d at 188, *aff'g Gurmankin v. Costanzo,* 411 F.Supp. 982 (E.D.Pa.1976); therefore, we do not know how the Third Circuit views the relationship between the doctrine· and equal protection law.

Other courts have uniformly treated the doctrine of irrebuttable presumptions as coextensive with the equal protection clause. *E. g., deLaurier v. San Diego Unified School District, supra,* 588 F.2d at 681–684 & n.16; *Fairfax Hospital Assoc. v. Califano,* 585 F.2d 602, at 608–610 (4th Cir. 1978); *Martin v. Harrah Independent School District,* 579 F.2d 1192, 1197–1199 (10th Cir. 1978); *West v. Brown,* 558 F.2d 757, 760 (5th Cir. 1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 520 (1978). In a series of decisions, most of which involve mandatory retirement statutes, the Second Circuit has concluded that where "the statutory classification is sustainable as rationally based, then it should not fall because it might also be labelled a presumption." *Palmer v. Ticcione, supra,* 576 F.2d at 463 (mandatory retirement for teachers at age 70); *Sakol v. Commissioner of Internal Revenue,* 574 F.2d 694, 696–698 (2d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978); *Johnson v. Lefkowitz, supra,* 566 F.2d at 869 (mandatory retirement for civil service employees at age 70); *Rubino v. Ghezzi, supra,* 512 F.2d at 433 n.* (mandatory retirement for state court judges at age 70). These case are consistent with the conclusion reached by Professors Nowak, Rotunda, and Young, in their *Handbook on Constitutional Law, su-*

*pra* at 497, from an examination of Supreme Court cases applying the doctrine:[10]

It now seems readily apparent that these cases actually rest on an equal protection rationale, for the objectionable portion of each law was the way in which it classified individuals. It was arbitrary classification . . . that was the impermissible basis of these laws. In none of the cases would a "process" have saved the law because the procedure would only have determined whether an individual fitted into one of these arbitrary classifications.

(Footnotes omitted.)

■ Having concluded that the classification adopted by the legislature is not suspect, does not impair fundamental rights, and is rationally related to a legitimate state purpose, and therefore satisfies the requirements of equal protection, we cannot find it unconstitutional as creating an irrebuttable presumption.

3. *Equal Protection Challenge to § 2 of the Act.*

Plaintiffs argue that, in exempting certain judges from the requirement of retirement at age 70, § 2 violates equal protection because it does not further the purpose of § 1, which is insuring a vigorous judiciary. The weakness of the plaintiffs' position is their failure to acknowledge that § 2 may be rationally related to a different legitimate state interest, and constitutional·for that reason. *Cf. Vance v. Bradley, supra,* —— U.S. at ——, 99 S.Ct. at 949; *Palmer v. Ticcione, supra,* 576 F.2d at 462–463.

■ Provision of retirement benefits for former public servants is a legitimate state interest; we doubt that plaintiffs would contend otherwise. Section 2 allows two classes of judges to remain in office long enough to secure pension rights under Ill.Rev.Stat. ch. 108½, § 18–124. See note 2, *supra.* The first consists of judges in

**10.** *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Turner v. Department of* *Employment,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975); *United States Department of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973).

office on the effective date of the Act, who are allowed to remain in office long enough to secure maximum pension rights. This is a fair and rational treatment for those who became judges before retirement at 70 was mandatory.[11] The second consists of those judges in office on June 30, 1973, who would not qualify for minimum pension rights if retired at age 70; they are allowed to complete the balance of their current terms when by doing so they will qualify for pension rights. However dubious we may be about the rationality of distinguishing between judges in office on that date and those who took office thereafter, when the significance of the date is not explained by anything before us, we cannot hold the Act invalid on this basis. Only judges disadvantaged by the classification would have standing to complain of it. *See, e. g., Warth v. Seldin,* 422 U.S. 490, 499–502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 221–227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Neither any of the named plaintiff judges nor any member of the class they represent complains that he was not allowed to serve until he qualified for a minimum pension while others similarly situated were given that privilege.

■ Section 2 is a temporary provision that slows the implementation of § 1 to alleviate hardships to individuals. As the Supreme Court has frequently held, when suspect classifications or fundamental rights are not involved, legislatures may implement programs gradually, or step by step, enacting laws "that only partially ameliorate a perceived evil . . . deferring complete elimination of the evil to future regulations." *City of New Orleans v. Dukes,* 427 U.S. 297, 303–305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976); *Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

4. *Challenge to § 2 of the Act under Illinois Constitution.*

■ Plaintiffs argue that the Act fails to provide "a prescribed age" for retirement as required by Ill.Const. art. VI, § 15(a), because § 2 exempts some judges from the Act. This contention is without merit. The Act does provide a prescribed age for retirement in § 1. Section 2's suspension of § 1 as to certain judges specially situated with regard to the pension laws does not, in our opinion, render the Act inconsistent with the Illinois Constitution, the framers of which were aware of § 2. *See* Constitutional Commentary to Ill.Const. art. VI, § 15(a), Ill.Stat.Ann. at 522–523 (Smith-Hurd). Consequently, we conclude that the Act does not violate the Illinois Constitution.

We affirm the district court's holding that the Act does not violate the plaintiff judges' constitutional rights.

*The Voters' Rights*

Plaintiff voters argue that the Act violates their rights under the equal protection clause by denying them the opportunity to vote for candidates of their choice. They cite *Bullock v. Carter, supra,* 405 U.S. at 134, 92 S.Ct. 849, 31 L.Ed.2d 92, for the proposition that the state must demonstrate a compelling interest to justify restrictions which have an impact on voters. We do not read the case so broadly.

In *Bullock* the Court began its analysis of the Texas filing fee requirement by observing that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." *Id.* at 143, 92 S.Ct. at 856. The filing-fee requirement created a "disparity in voting power based on wealth," *id.* at 144, 92 S.Ct. at 856, because it had the effect of denying ballot access to disproportionately more candidates favored by the less affluent members of the community. Because the

11. We are unpersuaded by plaintiffs' argument that upon continuation in office after a retention election, these judges should have been placed in the same class with other judges who accepted the office with knowledge of retirement laws. The reliance interest of the exempted judges was a sufficient reason for the classification.

requirement "falls with unequal weight on voters, as well as candidates, according to their economic status," *id.* at 144, 92 S.Ct. at 856, the Court applied the strict scrutiny standard of review.

No similar or analogous effect, *i. e.,* unequal treatment of candidates or voters identifiable by their economic status or political preference, occurs here. Any limitation on voting rights is incidental to a classification not aimed at voters or elections. The rational relationship standard is therefore applicable to the claims of the plaintiff voters as well as those of the plaintiff judges.

*Illinois State Board of Elections v. Socialist Workers Party,* —— U.S. ——, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), is not inconsistent with our conclusion. Although language in that case, —— U.S. at ——, 99 S.Ct. 983, could be read as subjecting any classification that limits voters' choices in whatever manner or however incidentally, to a strict scrutiny standard, we interpret that language as referring to the situation before the Court in that case and not as withdrawing *sub silentio* the statement in *Bullock* that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." 405 U.S. at 143, 92 S.Ct. at 856. It was consistent with that statement to apply the strict scrutiny standard to a classification that "impairs the voters' ability to express their political preferences." —— U.S. at ——, 99 S.Ct. at 990. In both *Bullock* and *Illinois State Board of Elections,* the classification burdened identifiable groups of candidates or voters, identifiable in one case by their economic status and in the other by their political preferences.

Our interpretation of *Bullock* finds support in the decisions of other courts and in the writing of commentators. *Plante v. Gonzales,* 575 F.2d 1119 (5th Cir. 1978), in-volved a constitutional challenge to Florida's "Sunshine Laws," which require public disclosure of candidates' personal financial information, and which, the court noted, had the effect of precluding persons from running for office. After analyzing *Bullock,* Judge Wisdom, writing for the court, applied the rational relationship test because the Florida restrictions "do not limit the choices of any particular group of voters." 575 F.2d at 1127.[12] In another case the same court concluded that strict scrutiny applies only when "the effect of the restriction was to exclude candidates of an identifiable group or viewpoint." *Morial v. Judiciary Commission of Louisiana,* 565 F.2d 295, 301–302 (5th Cir. 1977), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). The Second Circuit rejected the contention under consideration when it held that no substantial federal question was presented in *Rubino v. Ghezzi, supra* (2d Cir.), 512 F.2d 431. *Accord, Manson v. Edwards,* 482 F.2d 1076, 1077–1078 (6th Cir. 1973), and *Blessman v. Markworth,* 359 F.Supp. 1, 7 (N.D.Ill.1973) (three judge panel). *See Developments in the Law— Elections,* 88 Harv.L.Rev. 1111, 1218 (1975); L.Tribe, *American Constitutional Law, supra,* § 13–19 at 775–777.

We therefore affirm the district court's holding that the Act does not infringe the rights of the plaintiff voters.

Affirmed.

---

**12.** The court notes that lower courts and commentators have agreed that age requirements for officeholding "need bear only a rational relationship to state interests." 575 F.2d at 1126 n.10.